Case number 24-1076, Antero Resources Corporation and MU Marketing LLC Petitioners versus Federal Energy Regulatory Commission. Ms. Taylor for the petitioners, Ms. Gell for the respondent, Mr. Corman for the intervener. Morning. Morning, Your Honors. Charlotte Taylor for Petitioner Antero National Resources. The principle that a party that causes costs should pay its share of them is fundamental to a just and reasonable rate under FERC's and this court's precedence. But in the decision under review, FERC departed flagrantly from cost causation. Petitioner Antero Resources pays fuel rates based on the assumption that the gas it ships is always the last most expensive gas on the fuel curve, no matter what the operating conditions on the pipeline are. Even if the pipeline is operating well below maximum pre-expansion capacity, Antero is still assigned the most expensive flows. Even if Antero's usage stays level and other shippers increase their usage, Antero's rates go up. That has led to Antero paying a fuel rate that is triple what all other shippers pay. FERC has never explained why that is just and reasonable. To be sure, rates that depart from cost causation can be just and reasonable if they're supported by a valid policy consideration. But no policy ever articulated by FERC supports this rate structure. In fact, FERC has taken a wildly inconsistent approach to fuel rates on compression-only expansion projects. The first policy justification that FERC has offered, preventing overbuilding, is plainly inapplicable to fuel rates that pay for the ongoing operation of the pipeline. The second policy justification FERC has offered is protecting the reliance interests of pre-existing shippers. But this justification is inadequate multiple times over. Pre-existing shippers have no reliance interest in forcing Antero to pay for the most expensive gas, even at throughputs that are below the maximum capacity of the pre-expansion system. Pre-existing shippers are also sufficiently protected if they pay no more than the maximum possible rate under the pre-existing system. That's what this court indicated. Okay. So why did Antero not dispute the methodology when it was first proposed, in the first, you know, the first time the fuel rate methodology was proposed? The fuel rate methodology was proposed with the curve, but it was not clarified that Antero was always going to be assigned the last fuel that flows on that curve, no matter what the operating conditions were. And the other, you know- What would have led you to think otherwise? The certificate order said, this is the formula that's going to be used for your pricing. I don't understand why you think you weren't, you weren't sure that other people would increase the amount of fuel they ship. Because it didn't clarify. So it had that the fuel curve was in that filing, and it showed that the fuel rates went up exponentially, but it didn't clarify that Antero was always going to be assigned the most expensive flows. And so- It's not clear by the way the rates were calculated that Antero was being charged the last, you know, most expensive rate. So this was all, this was a pro, like there weren't actual usage to go by. So the fuel curve was presented, but it wasn't. So again, because- There were two more years with the same fuel, the same methodology, after it had actually been in operation, were applied and there was no objection from Antero. So 2018 was when the fuel curve, that was the filing that we were just discussing where the fuel curve was put in, but it wasn't clarified that under all operating conditions, not just sort of when we're over pre-expansion capacity, Antero would be assigned the last flows. Then in 2019, there was no proposed change because there hadn't been any sufficient data. Hang on, hang on, hang on. So in 2019, are you saying that we had 2018, 2019, 2020, in that whole time period, are you saying the system never went over pre-expansion capacity? I'm saying there wasn't a, so I'm not saying that. What I was saying there is that there was no fuel filing to sort of showing the application of the system in practice in 2019. So in 2018, we have the- Filing showing, you were getting charged. You were getting charged rates for three years. So- And you didn't understand how they were being calculated until 2021? So in 2020, we understood how they were, that was when we first realized how they were being calculated. So just, so 2018, there's the vague, there's the fuel curve, but it's not clarified that we're always going to be assigned the most expensive flows. And again, we're not just, if it's operating at 25% of pre-expansion capacity, whatever our section of that is the most expensive, right? So that's the, it's not just post-expansion, when we're using that extra additional capacity, we're always charged the most expensive flows. And that's what we was not clear. We couldn't figure that out until 2021. So I'll finish going through the chronology there. So in 2018, that was the proposal that we didn't, was not sufficiently clear on that. Then in 2019, the fuel filing didn't propose any changes or show any, you know, the applicable methodology because there was only, every year the filing works with the previous year's data, but because the project only went online in October, 2018, there just, there was no attempt to make that adjustment for 2019. Then in 2020, there was a 43% increase in our rates and we did protest at that point. So that was the first time that we had a full year of data to see how this was actually going into operation. We filed a protest and that was the point at which TGP made a filing that explained this last flows methodology and FERC did approve, but they told TGP to Tennessee to try to work out a solution. So we went into that process of trying to work out a solution. We thought that we had an understanding that this last flows methodology was not going to be, you know, was inequitable, but then what Tennessee came out with was this minor fuel credit instead of a fundamental adjustment of this overall last flows methodology. Taylor. Go ahead. So, I mean, you know, one of the arguments that FERC raises here is that, you know, in terms of not objecting to the methodology, you know, at the outset, but I'm wondering, I mean, with section four, I mean, there are annual filings of rates. So it does seem that it's permissible to challenge the rates, you know, at the point at which it seems, you know, that there are unjust and unreasonable. So I'm wondering if you could just speak to the relationship between the methodology and the rates themselves in terms of like petitioning or challenging. So just to be clear, I don't think that the commission has argued that it's like an impermissible collateral attack. Yeah, right. It's sort of an optical, like you waited. And I think I've just tried to explain, you know, chronologically at the first moment in which we were on notice of just how punitive this rate was and fully understood the methodology. We then did file a protest and engaged in this back and forth with Tennessee. But I also, you know, another important fact is that we had never argued for rolled in rates, right? We were always willing to accept that as expanse and shippers, it might be appropriate and just and reasonable to assign us a slightly higher rate, even though if you look at pure cost causation principles, we should be rolled in. And so it was when that rate got to triple that we, you know, at that point did, you know, have litigated this entire case all the way up to this court, you know, saying like, this is just no longer, you know, defensible or reasonable way actual cost causation or, and it's not tethered to the, I mean, to be clear, the decision affirming the ALJ's order seems to treat this as if it is consistent with cost causation and that's just patently not true. But even if we go a step beyond and look at the 1999 policy statement and the clarification of that statement and the rationales for treating incremental shippers or expansion shippers as needing to pay higher rates, none of those rationales justify what's happening here. Can I just follow up on that question? Because often under FERC, nowadays they don't adopt dollar amount rates, they adopt methodologies for calculating rates. And if someone, if the methodology is deemed just and reasonable and people bypass the time limit for challenging that methodology, is it your position that you can say, well, the methodology is fine, but the way the math comes out for me as an individual entity is unjust and unreasonable? Because I had thought the whole point of using methodological ways of calculating rates, everything from sort of fair market pricing to what we have here meant that the resulting numbers are just and reasonable. A case where we said a methodology is just and reasonable, but the output for one individual company under that methodology is not. So I can't cite you a case there, but I would also just reiterate that we did challenge this methodology as soon as it became clear what it was. So if you read the 2018 fuel filing and look at what was submitted there, there is no place there that indicates that we're always gonna be assigned the last. If you're not challenging the numbers, you are challenging the methodology. We're challenging the methodology and the numbers, but yes, to be clear. And that's my question to you is I'm not sure. Okay, well, I'll pick one. We are challenging the methodology and FERC has not argued that it's an improper collateral attack or that we actually forfeited. I'm trying to understand what's going on here. It's a little odd to say this methodology was fine for the first three years and then now it's suddenly not fine since the only change has been to give us a credit. But no, the only change is to give you a credit in the methodology. I know the numbers have gone up, but the only change in methodology is this credit system. Right, we never thought that the methodology was okay once we understood what it was, once it was clarified. I mean, surely these were questions that a reasonable company could have asked early on and filed a reconsideration motions request for clarification, but that didn't happen for three years either. Again, in the initial 2018 field filing, it was not, the field curve, they did the field studies and that showed this exponential use. And our rate at that time was approximately double what pre-existing shippers were paying. And we didn't run through, run to litigation because we were effectively not on, I mean, we weren't on notice of what the methodology was and we accepted- We were on full notice of what the methodology was. Nothing's changed in the methodology, again, other than this- Tennessee has not explained. There's no, in the 2018 field filing, there is no explanation of the fact that we're always going to be paying the last flows on the curve, no matter what. Is the operative thing that was missing there always? Yes, because if you look at the, let's say, assume that the pipeline previously had a capacity of 10 decatherms and we're paying for an additional two decatherms to be added. We're paying the most expensive gas on the pipeline, even if total throughput is four decatherms. If our throughput is, you know, one decatherm on that day, we're paying for the- That sounds like a methodology challenge, not an always challenge. Pardon? That sounds just like you're challenging the methodology. Methodology didn't say what in the methodology led you to think that it would be any different. And then the other time that this is, there'll be any different than what the curve shows? Because it had a fuel curve. It's, you know, it assigned us a higher absolute number rate. It was 4.something as the incremental shipper, but then we, and then it didn't explain exactly how that number was derived. And so we accepted that rate. And then once we saw the next year, and this is when our rate went up, but the next year that there were, was an adjustment to the methodology. So that's 2020. Our rate suddenly went up to by 43%. And that's when we asked, we protested, we asked Tennessee what happened because our usage had been projected to be 89% of the capacity. And they said, oh, but ours was actually less. And they said, the reason why your rate went up was because other shippers shipped more. And that was the first time that we were placed on notice that other shippers increased usage of the pipeline could cause our rate to go up, even if our usage had gone down or stayed the same. And so at that point, we asked for, we did file that protest. We conferred with Tennessee, and then they revised the methodology. And we thought that they would come out with something more meaningful than this fuel credit, which doesn't begin mathematically to offset the imbalance. I have a question. Pardon? Oh, sorry. All right. So when you discovered this, what were your options? So we filed a protest, and I think that was our main option. And then we- So you didn't get satisfaction from that. Now what options do you have? This has all been under section four. I'm focusing on options under section five. So we brought both a section four and a section five challenge, but the commission never reached the second step of the section five challenge because it found that the rates were just and reasonable. So we did- Under section four, that was it. Yes, correct. And so that's my point. From your client's point of view, why didn't you pursue section five? We did in this proceeding. So we- Oh, here's what I'm getting at. And maybe the FERC attorney can explain to me. If you're proceeding under both section four and five, if the commission finds pursuant to the automatic provisions of section four that the rate is just and reasonable, the statute allows it to stop there. It doesn't have to go on and consider, well, what other options may be out there because there may be some other just and reasonable rates. So your client, knowing that, I'm just trying to understand, you say you didn't know all this until 2020. It's now 2025. Has there been no opportunity for a section five filing where you could get the responses, maybe not the result ultimately that you might prefer in total, but you could get some of the responses you say FERC has refused to provide? So we did this, the challenge that's under review now has both a section four and a section five challenge. Because the commission didn't found it at the first step that this is just and reasonable on the theory that it does follow cost causation, it didn't reach the second step whether what alternative methodology would be appropriate. Every year since this 2021 challenge, we have been challenging the new fuel filing every year and those have been held in abeyance largely. Under what section have you been proceeding? The statute makes a very distinct difference. And you or your client has in one sense, more control in terms of forcing the commission to respond to certain things under section five than it does under section four. And you say, well, you brought both, but that doesn't help you under the statutory scheme because the commission is entitled to stop at section four. It doesn't have to go on to section five. Well, to be clear, it did reach the section five. I mean, it did say because we have found this just and reasonable under section four, the first step in the section five analysis is this just and reasonable. And so it's holding on the section four, it's a termination on the section four also disposed of the section five, it reached that. But then it said, we aren't gonna consider the alternative methodology that Antero had advanced because we have determined at the first step of section five that this is just and reasonable, right? I had some related questions to Judge Rogers about the remedy here in terms of section four and section five, because you are seeking, I think the remedy that Antero is seeking is to remand to FERC to do the second part of the section five. Yes. Is that right? So I just, I mean, walk me through that because they've made a section four determination as Judge Rogers mentioned, they found that this rate is just and reasonable. So it seems one remedy could be if we reverse that finding, it goes back to FERC and then I guess Tennessee would have to propose a new rate. So that could be a section four remedy. We were unable to find any cases where the court reverses a section four just and reasonable determination and then remands to FERC to do the second step of section five. I'm not sure that that's impermissible because as you say, they do reach, FERC does address the first step of the section five proceeding here. But if you could just walk us through how you think the remedy would work here if we were to agree with you that the rate was not just and reasonable. Well, I mean, I think that it, so we would be satisfied also with a new, go around under section four, because if this court holds that this is an unjust and unreasonable methodology, then Tennessee is gonna have to come up with something else that doesn't allocate to us the last most expensive guess on the fuel curve under all operating conditions. And so, if we go, I'm not sure that there's a, if we go back to the commission, because you found that this is, that it was incorrect at section four, that this is just and reasonable, then I suppose we could, the commission could hold further proceedings on the section five challenge, or we could take one of the next fuel filings out of its abated protest. Are you suggesting that NCARB doesn't have a preference between those two remedies? I mean- It's a brief to ask for further section five proceedings. Well, we, our preference is what we asked for, but if you are concerned that the section four challenge is logically, or is antecedent, I think we would accept that as a remedy. I guess I'm just wondering what your theory is of the fact that FERC can reach the section five question. If there's, if you have a case or some example where that has occurred. Of a case on remand to the commission. We have a similar situation like this, where there's a section four determination, and then it's sent back for FERC to decide what the just and reasonable rate is under section five. I don't have a case I can, but again, if this court is concerned that that is not permissible, then we would also accept just a finding that this is unjust and unreasonable, that the commission was, that its reasoning was arbitrary and capricious, and that there needs to be a do over with Tennessee at that point, proposing a new methodology. Why would it be within the wheelhouse of this court to dictate which approach the commission would take on a remand? I mean, our job, were you to prevail, would be to say the finding that this was just and reasonable was erroneous, and since they've self-described it as a section four ruling, to vacate that or bring it to that vacature, depending on the case, and send it back to the agency. Why isn't the agency's choice in the first instance what to do in a situation like that? I mean, I think, again, I would agree with that insofar as I don't think it's impermissible for the commission to take either route once this court has remanded, so. I'm asking about what our role as a matter of administrative law would be in this circumstance, not what FERC could decide. Are we even allowed to make that decision? Do we even grant what you asked for in your brief? Again, I think this discussion, I don't have a case of this that I can cite of this court directing FERC to conduct a section five proceeding in analogous circumstances. I can certainly, I don't, you know, I think it's reasonably common for parties to advance parallel section four and section five challenges, and then depending how things shake out, whether the commission reaches section, the second step of section five or not, the, you know, this court can vacate and remand for appropriate proceedings that for the commission to determine. I was gonna ask you about the 1999 policy statement. So that statement focuses a lot on construction costs and making sure that where a party is responsible for the expansion, they pay the construction costs. And then in our transcontinental case, we suggested that that can also be extended to fuel costs. And it seems, I mean, or at least we said that it was not unreasonable to extend the policy statement, but so are we bound by that decision? I mean, maybe also it might be reasonable to do so, but is it required for fuel costs to be, you know, to be allocated in an incremental way, or perhaps NTERA has already conceded that. We haven't conceded, but it is required to allocate fuel costs in an incremental way. As we point out, the commission has taken inconsistent approaches and different- You're not asking for rolled in rates. We are not asking for rolled in rates. So you're conceding that incrementalism for fuel costs, even when NTERA has already paid all of the construction costs or will be paying all of the construction costs, that incremental fuel cost rates are appropriate. So we have always- It seems like a big concession. I mean, after BNP Paribas, I'm not, you know, but if that's your position then. Well, I mean, because the commission does commonly require an incremental rate to be assigned to the expansion shipper, and we were- For fuel costs? For fuel costs. In an integrated system? I mean, we agree that that is inconsistent with cost causation, and that the commission should articulate a policy justification for departing from that. We don't think that the transcontinental case controls on the facts here. There's a very important, I think, you know, distinction, because in that case, the expansion shipper was paying their pro rata share of sort of general system rates, and then they were paying all of the electrical costs of running the new compressors. So an analogy here would have been if the methodology tried to assign us some pro rata share of sort of ordinary operating condition rates, and then assigned us the fuel costs for running, you know, the expansion system when it was required. But instead, what's happened here is that we're paying for the most expensive gas, no matter what. So even if this system was operating at, you know, 80% of pre-expansion capacity around the clock, we would still be paying the most expensive gas that's being used to run the compressors. And so transcontinental- Just to clarify, you have nowhere here argued that imposition of incremental cost methodology is itself error. As I understood your point to be, it's the application of the highest point on the curve as the measurement of your incremental costs, I think in your terms, as you said this morning, under all operating conditions. Yes, that's right. So that issue is just not before us. So whether it should have been incremental or rolled in. Correct, we will- And the fuel costs. Right, we proposed, you know, we have agreed, you know, we never proposed rolled in rates, I guess is the appropriate way to say it. You know, the question of whether- Yeah, it's not just that you didn't do that, that you have not protested since 2018 first conclusion that incremental costs is the appropriate way of dealing with fuel costs as well as construction costs. Right. And I think you've said in your brief many times, both briefs, many times, we're not asking for refueled rates, we're not disputing that. It's simply how incremental costs are formulated. That is your objection. And I think- The tough thing is once you've conceded that incremental rates are appropriate, it becomes harder to argue that the level of incrementalism is unjust and unreasonable. Well, I would disagree with that. So one, I mean, one important point, for example, about BNP Paribas is even in that case, after it was remanded to the commission, it didn't, the commission didn't just say, okay, we're rolling everything in because cost causation is equal. It went through this two-step analysis of analyzing what burden the newly arriving shippers were imposing on the gas storage and what burden the historic shippers were imposing. Then because it turned out that it was going to, because it was going to be sort of, you could apply a rolled in rate without imposing a, without imposing a subsidy, they did end up going with rolled in rates. So BNP Paribas, I think, is very clear that, you know, you can't just say cost causation and talk about proximate causation, which I think is what the commission has said in the decision under review and has been saying in its brief, is that we actually caused the increased, the increased use of fuel because we asked for this expansion project to be built. And BNP Paribas says, no, that's not what cost causation means. You need a policy rationale. Now that may lead to rolled in rates after you go through, you know, the analysis, or it may not. But it, and so again, we haven't seen what that math would add up to here. And it may be that we would end up with rolled in rates, but we would, what we would concede is that there has to be, you know, that there's an analysis and it's appropriate to conduct an analysis to see what are the burdens that the expansion shipper is imposing. And let's make sure that the preexisting shippers, that their contractual expectations are, you know, reasonably protected. And we may go through that entire process and come up with a number that looks like rolled in, but it wouldn't be the sort of, and in BNP Paribas, indeed, it was not sort of like, well, cost causation means rolled in. And so that's what is just unreasonable. And you're under all operating conditions. I'm trying now to parse that out and understand what you mean by that. You've talked about new shippers, but that's an argument you didn't raise before the commission. The commission told you did not exhaust before the commission. I would disagree with the statement that we didn't raise the later arriving shippers at the commission. I can read from our re-hearing petition. The current methodology would increase NTERO's fuel rate, even if an interruptible shipper begins using the pipeline. The interruptible shipper would enjoy a fuel rate lower than NTERO, even though the interruptible shipper would come later. Pardon? An interruptible shipper, necessarily a new shipper, or were there already existing interruptible shippers on this system? Not all interruptible shippers are necessarily later arriving, but what we're saying there is even though the interruptible shipper would come later and be the reason for the higher fuel usage. That's pretty vague. It's an argument about new shippers making this methodology is structurally unjust and unreasonable because of new shippers, because interruptible shippers always come in late. They're kind of the standby passengers, right? And so it's hard to tell from that sentence that you're making this whole structural argument that as to new shippers, which is not necessarily the same thing as interruptible, I suppose they could have a new firm shipper for whatever small amount they had on their original system. Well, if there were a new firm shipper who paid for an expansion project and got lower rates, then we would- No, no, that's not what I'm talking about. I mean, my understanding, maybe I'm just actually wrong here, is that at the time your client, Tarot, wanted to start shipping gas, it wasn't that there was no extra capacity or even no firm capacity on the pre-existing system. It's just that it was not remotely enough for what Tarot wanted to ship. Large amounts, right. But my question is, someone could come along and say, I'd like firm capacity, but it's only for that, a much, much smaller amount that would have worked just fine under the pre-existing system, correct? I suppose if somebody wanted- Well, that's where I thought we're just, we're coming up with made-up shippers here. You are too, and I am. So that's the point, is that just saying that there's someone else who comes later, changes everything, isn't quite accurate because the question fundamentally is, are they something that the pre-existing system could have accommodated or not? And that was the issue with Antero. I mean, Antero has a much higher production than Tarot said, and we want firm capacity, and we have such a volume here, we're going to add this new compression capacity and take 100% of it. But you have to divorce that from what was remaining on the pre-existing system. So it's hard to see how that argument could start clearly on notice that you were saying new shippers who would exceed, who need our new compression, who would otherwise exceed the pre-existing capacity are getting to jump ahead of the price rate line ahead of us. That's simply not what you argued. So, I mean, I would submit that we did, in the rehearing petition, raise the argument with the language that I just read, but I would also, taking a step back- If the commission says we don't understand that, then? Well, the commission didn't issue an order on rehearing, so a reasoned order. So we don't know what it would have understood or not understood from that. And I think also, you know, we were, so what the commission said in its order that we were challenging was, this is cost causation, which I think DNP Paribas and the commission's own decisions on remand from that just flatly contradict. Cost causation would be- Everyone admits that the treatment and cost allocations for new capacity, whether it's new pipeline construction or new compressor constructions or the many different forms it can take are, whether you want to call it an exception to cost causation or the real costs of your operation causation analysis. So I just, sort of invoking cost causation doesn't seem to advance the ball. What the, I mean, we're just talking past each other. What the commission says is we're making you responsible for the costs you cause, which is we're running these compressors. They cost three times as much to operate as the old compressors and the old system. And so, and you are the last one in. You've changed the whole thing. You've taken 100% of this new capacity and that's what you're using. But we recognize there'll be some benefits for everybody and that's what we're crediting back to you. But that's not a cost causation problem. It seems to me like it's almost more a factual problem with understanding what has caused your rates to come up. Is it, in fact, new shippers who couldn't be there but for your increased compression? Or is it all either new shippers or pre-existing shippers adding on to their load, all of which would be within the capacity of the pre-existing system? Is there an answer to that fact in the record? So the, I think the short answer is no because usage fluctuates, you know, seasonally. And so there are times where all, you know, the system is very close to maximum capacity and then there are times when the system is lower. In the, you know, on average, the system usage is around, let's say, you know, in the 21 filing, it was, sorry, in the 2018 filing, for example, it was 59% on average for the year. But I don't wanna- Can you let me clarify one thing? And maybe the 2018 is not the right way to answer that because you weren't coming online yet. But say for, by 2021, if there was some sort of average running capacity, when you give me a number like 59% or 80%, are you talking about of the pre-existing system or of the new system with your compressors? So I can come up with a number and try to, if there is. So their expert on recross at JA 616 in this 2021 dispute stated that Tennessee is generally operating below 100% of its pre-expansion capacity. So on average for the year, total usage is lower. Maybe the error here was that you even needed to add new compressors. Well, no, because there are times where we are, you know, the fuel usage is such, that we did need this capacity. So, I mean, there have been times historically where we didn't use it because the 7% markup was so punitive that we were, you know, I mean, this is a commodity. So we're taking a 5% hit compared to our competitors at the other end. And there've been times where that's just doesn't make economic sense. But there are also plenty of times in the record that it is operating at full capacity and we're using, you know, close to all of our 200 decatherms. I just, I wanna, I think that- When you say there's times, I'm sorry, I'm just trying to, my field and math is definitely not my field. When you're using close to 100% of your own capacity, then that would necessarily mean that either new shippers or increased capacity by existing shippers are all staying with the range of the pre-existing system because you're not leaving any room in your new added compression. I mean, I know it's all integrated, it's sort of hard. I know, but the answer doesn't come out with a name tag on it. But I mean, conceptually, that means that these folks that you're worried about are all, are all just using the pre-existing system. And so, you know, when we look at the language of some of our cases that there wasn't a need for, and maybe they're happy to have it there, but there just wasn't a need for the capacity for anybody. Increased compression capacity for anybody except Ontario. So I think that if the system were operating every month in that manner, then we might not be here because that's where they're getting this number that the incremental fuel usage is triple and so forth. If you get to 100% of the pre-existing capacity, and then also we're using 100% of our capacity, then the maximum fuel for the expansion is triple. But the fact is that that is not in the aggregate. Some months, the methodology is absent. Some months, and we in fact propose- In a perfectly fair way. Right, but- In some months, it's not working. And the problem is that the methodology isn't capturing even remotely fairly the months where that's not the case. Because even- We have a record about how many months are, and it doesn't have to be precise. So how many months is there enough usage, whether it's close to 100% or 90% of your own usage, or it's close enough that this methodology is fair, and how many months per year is it what you would call unfair? So if you want to look at some of the fuel filings, I can point you to around page 60 of the Joint Appendix. I think it might be like 58 to 62, but you can see the month-by-month usage overall. But I do want to just return to what is- So, to save- Pardon? Having to try to figure those charts out, can you tell me, is it half the year that it's okay, and half the year it's not? It's generally winter months where it is close to maximum capacity, and then for the rest of the year- Are you counting as West winter? Well, look at me. I mean, are you talking sort of meteorological winter here, three months out of the year, or are you talking a cold November can go into March, April, then get cold in October? I mean, I would say three to four months out of the year, but I can also reconfirm and look. But I think the important point that I- Yeah, three to four months might be when you're near max, but I think there's certainly a margin in just and reasonable for when you're not near max, but you're using a heck of a lot of your own capacity. It would be just and reasonable. Is there any precedent you're aware of where for a material portion, where we've broken down the just and reasonableness of a methodology, which is all you're challenging, that's on a month-by-month basis? Well, I think we would love it if this methodology were designed to capture assigning fuel costs to us when it's actually necessary to be using the- Yeah, that wasn't the question. My question is, is there any situation where we have said a methodology to be just and reasonable has to operate with this type of precision month-by-month, or can the commission say that sort of, look, over the course of the year, and they might disagree with you on how many months are in there, that it's just and reasonable on that basis, and we can't- Yeah, but this is always true for energy. Things will make it go up. Things will make it go down. Summer will make it be more intense. Winter will be more intense. Fall and spring, maybe not. Depends on what's going on with weather in different parts of the area covered by the system. So I'm just not sure of the sort of granular analysis, and if it is to be that granular, then did you argue to the commission that the problem here is that three quarters of the year, two-thirds of the year, it's unjust and unreasonable, but the other months, it's fine? Well, let me take a, no, I don't think that this court is in the habit of saying certain months of the year, it would be okay, and therefore, this is just and reasonable, because that would be a major tenery problem, right? We asked the commission- No, no, that's what I'm asking, to be crystal clear, my question is, is that what we demand of the commission for it to be just and reasonable? We demand of the commission that it articulate a reasoned basis for the rate that it is approving, and what the commission said here is that this approximates cost causation, which is just manifestly incorrect. If we go to the next step and say- There is a true-up, is there not? These are prospective rates. So there is, I guess, there is a true-up in the sense that- Exactly, so that the month-to-month is taken into account, in effect, in the year-end true-up. As I understand your argument, you're not fighting that. You're simply fighting the fact that FERC has not been willing to retroactively apply it so that you don't have to pay up front, and then, in effect, get some money back at the end of the year. You don't want to pay it up front because you'd say the rate is unjust and unreasonable, and FERC has come up with this other methodology. And that's why the fact that you didn't object early on, where you have experts or your client has experts, is so concerning here. So the true-up is, there are, I think, maybe two separate mechanisms that we could be talking about there. One would be that, at the end of the year, they just correct, like it was a prospective rate, and they do some correcting, but that's all based on the same fundamentally flawed methodology that we object to. And so nobody is arguing that that true-up rectifies this invalid. What I'm trying to focus on is your objection to the commission wasn't what you're arguing to us today when you originally were confronted with this methodology. Rather, as I understand it, and tell me if I'm wrong, your concern, or your client's concern, was it was paying too much. Its rates were too high. So the commission said, well, let's see if Tennessee, if we can become more efficient. And now your point is that, well, the credit and the efficiencies that Tennessee has implemented don't solve the problem. We're still paying too much. And somehow you presented to the court this theory that, because everything is computerized, everything can be done not only month to month, but day to day, hour to hour, so that there would be a floating rate for everybody. And sometimes capacity, as you point out, would be at 59%. Other times it would be higher at 70% or 80%, 90%. And so that's the way the system should work. And as I understand it, FERC has rejected that approach and adopted this other approach. And it's given a lot of reasons. And it really hasn't ever argued that this is the only just and reasonable approach. And that's why I asked you about section five. And I know you don't wanna pursue that, but at any rate, that gives you, you have the burden, and I realize it's expensive to do so, but at least then you get to get the agency to address the alternative system that you're proposing. So a couple of points there. One, we're not arguing that there needs to be a daily, sort of a different rate applied on a day-by-day basis. But what we are arguing is that the overall rate, which is based on these annual fuel filings, cannot be just and reasonable if we are always assigned the most expensive gas on the curve, no matter what the operating conditions, no matter if we're in a world where none of the incremental capacity that we paid for is even remotely necessary. Everybody, it's summer, it's quiet, where the pre-existing system is running at 40%. Our gas is still the most expensive there. And so that, I think, is the fundamental problem that we've been trying to get at. And so to go back to this, there are months where it would make sense. That's reasonable, and there are months where it's not. Right, but our point is that the overall, overall, this is not just unreasonable because it's not trying, it's not even remotely attempting to disaggregate when our incremental usage or our expansion usage is imposing additional costs on the system and when it's not. And I think transcontinental is a really helpful counterexample there because what this court approved was that the commission had said, these electric fuel engines are the compression engines. And so the expansion shipper should pay those costs. But for the rest of the costs, everybody's gonna pay their share. We're paying more than our share of even the fuel to ship gas when the expansion compression engines are not necessary. And that's the fundamental problem that it's not about. I have a question to make if I'm trying to, that totally cleared me from the record. So there are certainly at least times that this pipeline is operating when it's operating within capacities that existed before Ontario came along with its additions. At those times, is it just using the old compressors or is it always using the new ones now because they're more efficient? It's integrated. And so it generally does use the compression, the new compression. So it doesn't sort of reserve those and only use them when we get to 100% of pre-expansion capacity. So all the time, the new compressors are running. I mean, it's not in the record whether the new compressors run if we're at 10% of pre-expansion capacity, but they're always online. And so the pipeline operates in a manner to most efficiently ship gas. So whenever the new compression engines would be contributing to efficiency, they're going to be used. I'm not sure I quite know what that means. Do they only contribute to efficiency if there's a certain volume? I know that's not in the record to my awareness, but again, that's up to the engineers and the folks who are actually running the pipeline, but there's no sort of separating out of the compression engines and waiting to use them. So- The fuel credit, yes. The fuel credit, thank you for- Sorry. No, thank you, I appreciate that. The, for when your compression, your new compression benefits everybody else. Is that going to, when does that apply? Does it apply any time that they are at or below pre-existing capacity? So there's a helpful, I can find it. So the fuel credit kicks in at 80% of pre-expansion capacity, and it starts out at about 5.4% and then goes up to 11.5. So that's sort of the range. And that is capturing, it's designed to try to capture the fact that these new engines are more efficient. And so at every single point along the fuel curve, this segment of pipeline is more efficient than it was pre-expansion. So there's no, up to the maximum pre-expansion capacity. The reason why the fuel curve isn't adequate though, is that it's being applied to that baseline where we're already paying the sort of the triple rates that are based on the assumption that no matter what, our gas is the most expensive. So if you just look at, if it's, let's just say a day where it's 80% of pre-expansion capacity, there's that 5.4% fuel credit that's applied, but that's applied to a rate that assumes that we're shipping the most expensive gas. And that rate is based on, not just that day, but all other days, lower, higher, et cetera. And so in the year under consideration, before the fuel credit, our rate would have been 8.4%, I believe of, and other shippers would have been in the two. So we're looking at almost quadruple. The fuel credit is, it's helping a little bit, but it's not getting at that fundamental problem because of the way that exponential math works, right? You're subtracting an absolute quantity, but our rate is going to always be assigning us the exponentially most expensive gas. Mr. Rogers, do you have any more questions? Oh, okay. Thank you very much. You kept up a little bit of free time. We will give you some rebuttal time. Okay. Good morning. May it please the court. I want to start with a point that the panel has reached earlier during Petitioner's top side. Intero didn't just pick up spare capacity that was available on the pre-existing system. Instead, it demanded firm service, and that caused a new compression only expansion project that was designed and specifically built for Intero to be constructed. General system shippers, they didn't need or ask for this project. Their transportation needs were fully satisfied by the pre-expansion system, and they would have continued shipping on that system had this project never been built. This project was added solely to satisfy Intero's demand for firm service, which otherwise could not have been accommodated on the pre-expansion system. Therefore, Intero's project and its throughput, they are incremental to the pre-expansion system and the general system. Sure, I just, I understand why in a situation like this, Intero is on the hook for construction costs. But what is the theory behind why they have to pay incrementally more fuel costs? Because all the fuel in the system causes fuel costs, and everybody who ships on the pipeline sort of drives the cost up the curve. So, you know, a lot of FERC's arguments in its brief seem to me more generally about something like construction costs. But I guess I don't see the rationale for why fuel costs should be treated this way. Well, as this court and also the commission have recognized, the no subsidy requirement that general system shippers rates not increase as a result of a project that wasn't designed for them, that extends both to the construction costs and the fuel costs that the project consumes. And I, as to the point that all shippers along this pipeline contribute to the fuel costs, in a technical sense, yes, that is true. But from the perspective of the pre-expansion shippers, they had subscribed to a system with a certain set amount of capacity. And their expectation was that on average, the fuel costs would be at a certain level. They didn't anticipate that an expansion project would be built to add 200,000 decatherms per day of service, and then incrementally, exponentially increase fuel costs across the board. Therefore, under the no subsidy requirement, their fuel costs have to remain what they would have been had this project never been built and had interior throughput never been allowed on to the system. I always said just and reasonable, even when new shippers are now shipping on the pipeline or the existing shippers ship a much greater volume on the pipeline. I mean, it seems that circumstances have changed. And I mean, section four filings, they're annual rate filings, right? Which assumes that changes in circumstances may change what is a just and reasonable rate. You know, you don't just sort of put a rate in place and let it go. It has to be found every year. And at this point, where Antero's playing roughly what, triple or something, the rates that other people are paying, how is that consistent with cost causation? Well, as a visual matter, this is a compression only expansion, which is rather unique. Typically expansions are some mixture of compression and pipeline work that expands the diameter or builds looping. And so this kind of expansion tends to be very fuel intensive. And- I understand that, but that doesn't, yeah. I mean, I understand how this system works. Right, right. And so far as the project facilities are three times more fuel intensive than the pre-expansion system. It's honestly not unusual on an expansion, a compression-based expansion for the incremental fuel rates to be several times higher than the system fuel rates. It's simply the result of being the incremental shipper on an exponential fuel curve. And Tennessee, for example- Why is Antero in perpetuity the incremental shipper? Because it's need- That doesn't seem to be explained. It's need for firm service is what caused the project to be constructed and its additional throughput to be accommodated on Tennessee's pipeline. Without Antero throughput, the general system shipper fuel rates, if they're average across all shippers, would be exponentially lower. And so in order to keep them in the same ex-ante position that they were in before this project was built, that exponential increase in fuel rates has to be allocated to Antero.  Not forever. There could come a point in which Antero is able to demonstrate under the commission's test that its project creates greater fuel efficiencies than its fuel costs. And at that point, Antero could roll in its rates. And relatedly, again, it's not even- I mean, they're, very modestly here, not even asking for rolled in fuel cost rates. They're saying that they are willing, they understand the need to pay some incremental rates, but that this level of incrementalism is too much. The three times difference in fuel rates is, again, not unusual for compression-based expansions. It also reflects the much greater fuel intensity of their facilities. And- Not just their facilities. Everyone is using these facilities. That's where the crediting mechanism comes in. So crediting is like a tiny haircut. But that is what the fuel study has demonstrated. It maps out the difference in the fuel consumption between what the pre-expansion system would have consumed at each throughput level and what the post-expansion, i.e. the project plus the pre-expansion system, consumes at each throughput level. And the difference is what is credited back to Antero. Therefore, pre-expansion shippers, the general system shippers, they're paying exactly what they would have paid had this project never been built. If Antero is complaining that the crediting mechanism is small, that's because the fuel efficiencies provided by its project is just not that great. If the fuel efficiencies were greater, then perhaps those costs could be rolled in. But because it does not provide an overall benefit, its costs are overall greater than the fuel benefits that it provides, those costs cannot be rolled into general system shippers' rates. So, if I am to your point that pre-existing customers had sort of an expected fuel cost, a pre-Antero expected fuel cost pipeline. But I assume that was not a static expected fuel cost. That is that the extent they wanted to increase their own shipments and everyone's rates would go up. Or if new people came in, but unlike Antero, they could sit within the pre-existing system, that would increase their rates too, right? It's just there was sort of a cap on how much they would go up given the capacity of the pipeline. That's correct. In the pre-existing system. That's correct, but I do wanna. Let me just finish the question. I do wanna hear your answer. So, why isn't the Antero correct that at least to the extent that it's unjust and unreasonable to have them pay the higher cost? That's occasioned by, it may be that Antero's amount even stays stable, but that the increase is actually coming from increases from the pre-existing shippers or new shippers. So, in that situation, nobody had a reasonable expectation. No pre-existing shipper had a reasonable expectation that their rate was going to remain. There's gonna be a solid number and it would be that number every day for 365 days of that year. They knew going in that there's a capacity for the pipeline. And at least as long as we stay within that original capacity of the pipeline, their rates could go up based on other people coming in or other people who are already in there increasing the amount of gas they are transporting, right? Is that right? I wanna clarify. I just wanna answer my question. They certainly had to reasonably expect that their rates could go up and down based on what other shippers do as long as it's within the capacity of the original pipeline, is that correct? Pre-existing shippers could expect their rates to increase based on other shippers' usage, but the pipeline though, it's designed to accommodate peak day capacity. Peak day is when the demand for natural gas is great. It's the coldest days of the year where the throughput is at its highest and it's near or at the maximum capacity. The thing about peak days is that they are rare. They are not the average day on a pipeline. On average, the pipeline's throughput is significantly below peak day capacity. If it were otherwise, then that pipeline would be in serious trouble. And so the expectation pre-existing shippers had was that on average, their throughput would be at a certain level. And yes, that throughput could increase all the way up to the pre-existing maximum, but that is on a rare peak day. If however, you have an incremental shipper come in and they routinely exponentially increase fuel rates, that's not within the expectations of pre-existing shippers. And that's why, because Antero exponentially increases fuel costs for everyone. Why is that? Why is it that, so they couldn't, if you're saying that they couldn't have contracted to have, I forget what it was, what the capacity was. Was it like 80% generally operating at 80% before? I mean, I forget what the number is. Before, I don't remember quite, but perhaps average capacity is somewhere around 70%. Okay, all right. But, you know. Is there a average capacity cap on a pipeline that it has to have so that it always has room for the peak days? Not that I'm aware of, but if a pipeline is hitting its maximum capacity so frequently that on average it's near that capacity, then it needs another expansion. So the maximum capacity is an understanding to pre-extension shippers. You know, I will sometimes hit this on peak days where it's really cold and a lot of people need natural gas. Yes, we'll hit this and we'll hit those maximum fuel rates. But on average, my costs are gonna be significantly below that. And if someone else comes in and pushes those costs routinely, day to day, higher exponentially, that's not within their expectations. Okay, but I mean, the point is that I don't think there's any dispute, maybe I misunderstood it on Tiro, that it makes sense for them to get the sort of last exponential rate on those peak times or even the heavy times, not even saying days, but times when things are really going full bore. But I don't still understand why for all those days when pipeline is operating at a capacity that's even below the pre-existing capacity. Right, even in Tiro isn't putting it up, pushing it up beyond the pre-existing capacity, that they should still have to pay. Because as long as you're within pre-existing capacity, that would have been with people's expectations, or at least some part of that would have. And Tiro is asking to pay the general system rate at any point at which it is below that pre-expansion maximum. And so if you'll think of it- Everybody wouldn't have expected to pay pre-expansion maximum every day. Right, it's an asymmetric comparison, very similar to the kind that the commission rejected in that 2016 certificate order. They're trying to compare the peak day conditions, pre-expansion versus current or average day operating conditions under the current system. And because it wants to have its rates rolled in for every point up until that pre-expansion maximum, that would be quite a lot really. It's asking, I only want to pay incremental rates on those rare days in which the system's throughput is near its maximum. But on average, it's increasing exponentially fuel costs for everyone, most days, and not just on those few days. I get that point. What I'm trying to understand is, sorry, put the numbers here. So 70% is sort of, let's just assume that's sort of a normal average. Obviously 100% we'll say is sort of your peak day. But most people would have thought they'd have to pay on peak days, that they're gonna have rates some days that are gonna be close to 100% capacity. Did the commission grapple with whether there's any room between that 70 and 100, just to simplify things, 70 and 100% for some increase? It has to be that there was some room in there for increase on non-peak but more demanding days. And so up to 80%, maybe to 90%. Are you telling me that other than peak days, it never goes above the 70%? I'm saying on average, because what insurance is asking for is they only want to pay incremental rates when the average system's throughput exceeds the pre-extension maximum. And so on average, that's very rarely ever gonna happen. I understand that, I completely understand your argument is that, because everybody didn't expect that they would be, paying sort of the equivalent of running flat out, highest rates all year round. But the question is, did they expect that there wouldn't be any increase in rates? No, I don't think that's true. But does the methodology sort of keep them at that pre-existing average rate, as opposed to recognizing that the pipeline could have admitted another shipper, maybe either another firm shipper if they just didn't need very much, right? On the pre-existing system? Or was it not allowed, was the pre-existing pipeline at a point where it couldn't let anyone in for a firm shipment commitment? It could only do interoperable service. I believe there was some small amount of capacity left over on the pipeline. Well, then everybody had to expect at a minimum that their rates could have gone up to that increased extra amount of extra capacity. But that level isn't defined, and it's a level of precision that isn't- Well, you're assuming here that I'm talking one or two points, but I don't know that. How do I know from that that, in fact, because new shippers have been allowed to come in, and existing shippers have been allowed to increase rates. And how do we know when, in doing that, they are staying within what would have been allowed under the pre-existing system, or they are taking advantage of Antero's inferences? How do we know when that line is crossed? Well- Based on this record. To address that in two parts, as to new shippers, the record has no evidence that there have been new shippers coming onto the pipeline that have been raising rates beyond what pre-extension shippers could have expected. These 100 new contracts that Antero never presented to the commission, it's just completely unknown. Are they for service along the same pathway as the project? The project is only one small portion of Tennessee's overall pipeline, which is 11,800 miles long. And so it could be contracts for an entirely different part of this pipeline. It's also not known whether these are contracts for firm or interruptible shippers, or if these are extensions or rollovers, or if these purportedly new shippers had negotiated fuel rates. There's so many different factors as to these new contracts, if they exist, and what circumstances another shipper might or might not have joined the pipeline. But because this is all so subject to extensive speculation is kind of the point. Antero's failure to raise these arguments earlier and put forth these contracts that alleged to exist in front of the commission so that all the parties could examine them, they could brief on them, their experts could testify about these contracts, just makes it very inappropriate for us to be trying to delve into the concrete details for the first time on its own. I completely get that point. That's well taken. But what I'm trying to understand is what was the range of reasonable expectations on increased fuel costs for the preexisting shippers? And it seems like the commission just sort of assumed stasis, whatever the average was. But if in fact, that was an unrealistic assumption because it seems to me it could have been because pipelines always want to take in as much as they possibly can, making sure they'll still have room to deal with peak days, that some of the increase that has come in, some new shipments that have come in are sort of freeloading on Antero's rates because some of them may be within that preexisting capacity but then preexisting shippers had to assume their rates would go up for that amount, right? And then if there's others that come in after that, then those folks shouldn't, they have no reliance. And I say after, it could be preexisting shippers who increase even more than they otherwise would have. And so why doesn't the methodology need to allow for, to be reasonable to allow for the fact that people didn't think the average capacity was going to stay exactly as it was. That's not how this business operates. And that in fact, there would be at least increased shipments by some or some new shippers allowed in. And that's going to increase their rates. Right, but I think the methodology does allow that by always assigning Antero the last curves and every other shipper being assigned what's left over on the field curve. It means that those general system shippers, their rates are allowing for everything, every throughput on the system that's not Antero. As to those, I get that it's allowed to function that way but as to those increases, those increases that would have happened Antero or not under the pre-existing system, why should Antero get the highest rate as to those? Why should it have any higher rate than everybody else in the mix? Because they're incremental to the overall system. If there is any increase- They're more incremental than a new shipper that comes in or an increase by a pre-existing shipper that didn't exist in 2018 when this all started. They're not incremental as to increases that are beyond the baseline when they joined but were well within the capacity of the pre-existing pipeline. That's a margin there that they are not responsible for and that those folks shouldn't, there's no reason that those folks should get to pay less than Antero. Well, I'm not really sure that these new shippers even exist on this pipeline. Or pre-existing shippers, I mean, has any pre-existing shipper increased their amount in the last seven years? I have to think someone has. But I'll take your point that it's true. Antero's fuel costs can increase when general system shippers increase their own throughput on the pipeline, but Antero's rates are still nonetheless calculated based on its own actual billable volumes that Antero itself ships through. They're calculated at a different rate. I'm asking why there should be any difference in the rate. I get that they're paying for their own volumes. The rate at which they're paying for those volumes. And I don't know why they should have a different rate when there are pre-existing shippers or new ones or intermittent ones, is that what you call them? The ones that sort of- Reputable shipper. Sorry, the standby folks. Everyone knows this is gonna be coming in. The pipeline's in the business of wanting to get more customers in. That's how it makes more money. And so, I'm repeating myself, as to that change, at a minimum, as to that amount of change, there's no reason Antero should pay a different rate than everyone else. It's only when the volumes come in are volumes that couldn't have come in under the pre-existing system. Could not have come in under the pre-existing system. Well then, they made it possible. And we'll put brand new shippers to the side because of the record issues. Right, right. Hopefully this can help clarify. Antero's subscribed to 100% of the capacity of this expansion project. That means that if these other shippers are increasing their throughput, that's necessarily pre-expansion capacity because they're not sharing in any of the incremental capacity created by the project. Well, it might be more than they could do if you didn't have this increased capacity because there would be no, right, they can now go up to sort of 100% of pre-existing capacity and have no worries that peak days could still be met because you have this increased capacity thanks to Antero. And so that margin, so we talked about starting at 70%, but let's say they could go up to 80, 85% and still be good to have room for what they need on peak days. Now they can go up to 100% of pre-existing capacity and still know that they're good for peak days because they've got the Antero additional capacity. But there's no evidence that that is, in fact, what is occurring. And shippers aren't going to transport their gas for no reason. They're only gonna transport when the demand is there. And the number of peak days per year, as far as I know, those aren't really changing at all. And so if there's no reason- That's the problem. All the rest of the year has, have shippers increased what they shipped beyond what they were shipping on the pre-existing system. And why doesn't the system, why doesn't the methodology need to allow for that? Because those are times when it's got nothing to do with what Antero has added to the system and Antero's fuel is there just like anybody else's. I take your point that from year to year, if general system shippers increase their throughput, then Antero's rate could increase even if it's not changing anything about what it's shipping. But that cuts those ways. Anything about what could have been shipped had it not created its new increased compression? I don't believe so. But I do want to reiterate that this range, what I believe to be a reasonable range of precision cuts both ways. So from year to year, if the general system shippers decide to ship less, then Antero's fuel rates would also decrease by no virtue of its own actions. It could be shipping the more, the same amount of gas or even perhaps more, and it could be paying a lower fuel rate. By no virtue of its own actions. So how is that consistent with cost causation? It's the reasonable range of accuracy that this methodology presents. We can't precisely track each ounce of fuel as to who caused the need for that fuel. Necessarily, there's going to have to be some administrative line drawing. And what the commission found is that what Tennessee proposed is reasonable within that range. There's no way to become incredibly precise in tracking each iota of fuel and tracking each shipper's- I think Antero's asking for a precise point, just something that is more reasonable than the current rate. But the current rate, as the commission found, is reasonable. It is, granted, not the most precise out there, but that's not what section four requires. Well, I think that for some of Judge Millett's questions, I mean, wasn't FERC required to think about these questions of how the other shippers affect where we are on the fuel curve in terms of setting the rates? It did think about that. In the initial decision, the ALJ recognized that other shippers could, in fact, increase Antero's rates if they shipped more. But again, that was within a reasonable range based on, again, a reasonable approximation of these fuel cost allocations by Tennessee's methodology. It's not going to be precise in tracking every ounce of fuel and every difference in shippers' usage patterns, but the commission doesn't require that in its cost allocation methodologies, and especially for fuel cost causation, because it's not really simple to determine who's causing what amount of fuel to be burned. It's, first of all, not a linear relationship, but it's also impacted by several different physical and engineering technical factors. And so even if we were able to accommodate some increase in shipper usage up to an expected average line, it's also possible that the fuel usage would not actually reach that due to differences in how that fuel is flowing through the system, the environment, altitude, temperature. There's just so much that goes into this. I think that is related to the basic question about whether this assigning Antero the last incremental cost is just and reasonable. Yes, of course, there are lots of factors that affect where you are on the fuel cost curve, but that has nothing to do with the basic rationale that Antero's always assigned the last fuel, like the last and most expensive fuel cost. It is. I don't think those things, I mean, how are those things related? I guess I should ask. Because it's the commission's balancing of two somewhat related, but at times competing interests of the no subsidy requirement and cost causation, because the commission recognized that Antero is the one whose throughput is incremental to the system who caused the need for this project that allowed Tennessee's fuel consumption to reach the top of the curve. But it's assigned that difference between what the fuel consumption would have been with Antero's throughput and without. And so that is the commission's best and reasonable approximation of the fuel consumption pattern. To ask for something more precise than that, I don't believe is required by cost causation. Begging the question of what their costs would have been without Antero. And if their costs, I mean, I don't, I mean, shippers have to assume that other people might ship more. You know, you can't assume for a year that nobody's gonna change and everything's gonna remain exactly the same as, you know, last year's average. And so what they would have expected to pay or recognize was a range of changes that could happen. We're not talking about one and 2% here. We're talking about, you know, of 10 to 15%, maybe even 20, I don't know how much they need for the peak days. But if they could have gone up to general operating on 85% instead of 70%, and if, you know, most of the days everything's in that 70 to 85% range, then I still don't understand why it was reasonable to make Antero on those 70 to 85% days pay as though it's at max capacity on its new system. I just don't understand what, I don't understand that. I don't know why its fuel cost should be any different and why, you know, and yes, maybe they're the ones that happen to be, maybe their fuel is the one that is pushing people from 70 to 85% or maybe not. Maybe they're responsible for 3% and some pre-existing shippers who are increasing their amounts are responsible for a 5% and there's a new shipper coming in, either firm or bystander, and they're increasing it. But that's all within the normal expectations of shippers. And so it seems to me that FERC had to know about, has to know how these things operate. And so when you're concerned about protecting reliance interests, it can't be a freeze everything in time approach. And there's only certain times when in fact the presence of Antero's fuel is gonna be made possible because of Antero's project. Those are the times when Antero should be paying its costs, the costs, the increased costs as a result of its presence on the system. But if it turns out a third of the year, a half of the year, its presence isn't doing that, then I don't understand why it's fair to assign them the higher costs. Well, the Tennessee's methodology does accommodate that flexibility that you mentioned. If general system shippers ship more, they increase their own throughput, they're assigned a larger portion of the fuel curve too. It's just- That's completely different. This is about the rate, right? They'll be at a completely different rate though. To have more at 2.8% is very different than having more fuel at 7.8%. But their rates will also increase because of their increased throughput. So will Antero's. Antero's rates will increase too, but the rate at which the rates increase- Why shouldn't the rate be the same for everybody who's in that, and I'm making these numbers up because I just didn't see for our analyzing, in the 70 to 85% range, why should Antero's rates be different than anybody else's? Everyone's rates will go up, but they'll all go up the same amount. Because at that point, the increase in cost has nothing to do with Antero's new project. It may have to do with the fact that Antero is shipping fuel, but they don't care if it's Antero shipping fuel or company X that's shipping fuel. They all know our price rates can go up X percentage any given day based on what other people ship. So it's only when the increase in volume, which means the increase in their cost, is because we're doing more than we could have without Antero's system. It's not just Antero's presence, it's fuel, it's that it's system that it has created. It's new project, it's new capacity. It's only when Matt kicks in and say, all right, well then you're gonna pick up the tap. But at no point are pre-expansion shippers shipping more than they could have without the project. Their capacity is not going to exceed the pre-expansion maximum capacity. And so if they're shipping more- That's the point. Right. Without Antero being there, they couldn't go up to max capacity. They had to leave room for PKs, right? No, they could go up to maximum capacity. Okay, I thought you would begin this whole argument by saying no pipeline runs at max capacity all the time. They'd be in real trouble because then they wouldn't have room for PKs. But now you're saying- No, they can reach the same capacity. It's just that if you're constantly at max capacity, that seems like there's a lot of- If a pre-existing shipper is increasing amount, now if they're just doing it for a short time, that's fine. But if they say, hey, we've got a new customer, so we're going to increase our capacity 10%, and we're going to do that on a sustained basis, could they have done that under the pre-existing system? Only if there was that capacity, firm capacity already available. And if that capacity was available, then there's no reason that their 10% increase should be at one rate. And if Antero shows up that day and says, look, for the next six months or year, we've got a contract where we're going to increase capacity 10%, we're going to use that unused capacity on the pre-existing system. There's no reason that Antero versus pre-existing shipper versus new company acts should have any different rate. They're only acting within the limits of their own contract. They're not exceeding the capacity that they agreed to with the pipeline. And so I understand the concern is, if Antero is not changing anything and these other shippers are increasing their throughput, then it shouldn't, it concerns you that Antero's rate might increase by virtue of being the last flows on the curve. But again, it just- Without any usage of its system that it- Right, but that still falls within a reasonable range of precision because like I mentioned, it cuts both ways. The opposite is true as well. And within that- It doesn't cut both ways. That's the problem is if other shippers go down, their rate, I mean, their bottom line dollar may go down, but they're going to go down a heck of a lot slower than everyone else because they've got such a higher rate. Antero's rate is going to go down if general system shippers decrease their throughput and- But not at the same rate as others. I mean- It would actually decrease at the same rate as it increases. It's just the reverse. I'm paying a 50% tax and Judge Rao is paying a 35% tax and they go, well, next year, we're going to reduce everyone's rates by 3%. Like mine goes down, but it's still way higher than hers. And if there's no rational reason for us to have a different rate, I still feel quite put out. But the rational reason is that you were the butt for CODS for the past- They weren't in the range that I'm talking about for dealing with pre-existing capacity, right? Right. They weren't causing anything there. Right. I think maybe if I- There needs to be a connection between their usage and the need for the new capacity to justify the increased rate. And that's the argument in this case, that there's been a break. That the new capacity, we have those frigging generators turned off for the month and we're still going to get charged more. I mean, it'll only get charged if it actually uses its capacity, but you know- It wants to use the pre-existing capacity. Right. But I think just to go back a little bit, when I say it cuts both ways, it does to the same extent as well. So say, you know, Antero doesn't change its throughput and its rate increases by 10% because other shippers ship more. The reverse is also true, that if other shippers ship less by the same amount, then its rates could have decreased by 10% by virtue of just other shippers changing their behavior patterns. And it's not going to be a precise relationship, but the act of trying to track these shipper usage patterns and delineate, you know, how Antero's rate should increase or not increase based on who's causing increased throughput. That's, that would be a very, a very unduly intricate and burdensome mechanism. I'm not really even sure how that would particularly happen, but- The alternative- If it came in, if it were sent back to say, look, you don't seem to be grappling with the preexisting capacity on this pipeline and why Antero should pay a different rate as long as everyone's still using preexisting capacity. And so this differential doesn't make, differential may make sense when they're used, when to get their gas onto the system, when they have to use the new system they constructed, new compression is needed. That's fine, but until they hit that point, and somebody can figure out that, some expert, I'm sure there are experts you could pay to figure out what that point is, and say, once the pipeline's operating at X capacity, that's it, because no reasonable pipeline would subscribe to any more gas at that point. And so any capacity operations over that, so it's just a mathematical formula based on the amount of capacity that's being used. Someone else can figure out whether you do that daily, monthly, or you go and do the true up at the end of the year, however you do that. But it seems to me at that point, if it's untenable, I'm sure experts will weigh in on that, but otherwise it's hard to know why their gas gets cost more than pre-existing shipper X's decision to increase and do 10% more on its part. Right, maybe if I frame it this way, this might help a little. In terms of expansion was built under the assumption that the pre-expansion system was completely maxed out. Their capacity was already fully subscribed. And so, no, under the assumption, that's how the facilities are designed. And so one approach Tennessee could have taken was to say, we're just gonna always keep you on this spot on the fuel curve at the 100% pre-maximum expansion and have your fuel kind of start there on the curve. Set you here and if you ship more, we'll calculate your rates starting from this minimum level. And if you ship less, your rates will also decrease. But again, using the same minimum level. But Tennessee instead decided not to hold Antero to this assumption that the pre-expansion system was going to be maxed out and would let its rates sort of decrease and rise with changes in shipper behavior by other shippers. That results in lower fuel rates for Antero. If Tennessee had stuck with the original assumption under which these facilities were designed, which is that the pre-expansion facilities are completely maxed out, then Antero would be paying higher rates. It's just because that it allows Antero's rates to sort of rise and fall on that curve along with everyone else's that it feels, I think, to go against cost causation. But a rate in which- Wasn't the pre-expansion system, as a matter of fact, maxed out? That was not my understanding. I don't believe that capacity was fully subscribed. I don't know what was left over. Maybe unofficial to create. But that's how- The methodology is based on that assumption. I don't know how that would solve the problem. It would probably make it worse. That's how the project was designed, however. That the horsepower associated with it was under the assumption- They wanted to be ready because on some days, because sometimes it may well be at or near max capacity, and they still want to be able to get their gas in. So that makes sense for them as an engineering matter to design it that way. But as an engineering matter, it's very different from a methodological matter of charging rates when, if it's true, that the majority of the year, it's not maxed out. But it sure didn't subscribe to a mixture of pre-expansion capacity and its project capacity. Its precedent agreement is just for the expansion project capacity. And so what Tennessee is effectively doing is treating them as if they had some part of this pre-expansion capacity, thus letting them pay lower rates than they otherwise would have- Are they using, at times, part of the pre-expansion? I mean, I don't know how we can sort of differentiate this, but again, just assume their compressors are off. There are days when they can get whatever gas they want to get in and still be within pre-expansion capacity. Yes, there are days in which that's possible. I don't know as to the frequency, but there are days where that does happen. But let's assume, now, if it were freakishly uncommon, that would be important to know. But if, in fact, it's not uncommon, then it seems artificial to calculate a rate on the assumption that they are never using the pre-existing capacity, and instead must always be treated as using their own pre-existing capacity. I don't believe that's artificial, because if they had subscribed to some of the pre-expansion capacity, the project would have been smaller. It wouldn't have been 200,000 decatherms per day of firm capacity. And so by allowing them to have their rate treated as if they are sharing in some of that pre-expansion capacity that actually puts them in a better position than they otherwise would have based on how this project was designed. I'm gonna ask a question about the nature of Antero's use. In other words, we don't know the details of the existing shippers' contracts, but it could well be that there are provisions in those contracts that not only protect them, but make it clear that their rates can go up and down and either in a section four or section five proceeding and on other grounds. But these shippers always want to be sure that they have whatever firm capacity they may need, whether it's in July or December. And that could vary, obviously. But they're paying in part for that reserved firm capacity that may not be used 365 days a year. All right, so that's their guarantee when they enter into this contract. So Antero comes along and says, it wants firm capacity. And in my hypothetical, the pipeline says all of our firm capacity is under contract. It may not be being used 365 days a year, but other shippers have already paid for it or we have contracts with them where they're going to pay through their annual rates. I get that, but I want to be clear what it means when we say, unlike existing shippers, and maybe I've misunderstood this, Antero's compression use is three times greater than what existing shippers use. And please correct me if I'm wrong, but I understood that was something, just the different nature of the operation that causes Antero's rates to be so much higher because of this three times compression use and so their rates increase exponentially. So conceptually, it's not as though the preexisting pipeline had any capacity that was available for Antero. So the commission agreed it could build this new. And some of our questions, it seems to me, are pushing back against our notion that, well, you pay for construction, but isn't fuel different because we all pay the same for fuel. My understanding was that was not quite the situation, at least, that was presented to the commission. I don't know what else might've been presented, but at least what I understood was Antero wasn't contesting any of what I just said other than the fact that its rates were too high. And so the response of the commission was to Tennessee, was let's work on this. And so you had competing experts and they came up with this credit system. And that's just not good enough, says Antero. But I need to be clear that you say there are two policies. It's a 1990 policy. And I understand that in the sense that the existing shippers have already contracted for 100% of Tennessee's firm capacity. But I want to understand, is it because of the nature of Antero's use of its, part of the system, namely the expansion system, is just different? So that that's why its rates increase exponentially. I guess I'm not clear in my own mind conceptually about, I understand why it pays for the construction. I understand why it pays for the fuel it uses. But I'm not clear why it's three times greater than an existing shipper. It's due to the exponential nature of the fuel curve. So if we had a linear fuel curve, then none of this would matter. My understanding is that's not unique to Antero. That's correct. The exponential nature of the fuel curve is not necessarily unique to this pipeline. It's perhaps possible that the curve is more intensely sharply curved upwards than other exponential pipelines. But the general exponential nature of a fuel curve is seen on other pipelines as well. But it also explains why its fuel rates are three times higher. Because for example, if Antero, if its throughput adds 11% to the system, it potentially can cause something like a 23% increase for fuel usage. So it's not a commensurate 11% throughput, 11% increase in fuel usage. It's just so much higher. And to account for that exponential nature of the increase, that's all factored into Antero's fuel rate to keep the pre-extension shippers at the rate that they would have been had Antero not joined the system. And to your second question about the project facilities, they're three times more fuel intensive than the pre-extension system because they're compression only. The pre-extension system is this mixture of pipelines and compressors. And so when you have that sort of combination of structures, it's not just entirely compressors that are consuming huge amounts of fuel. And the nature of Antero's use, it's that it was added to this system only by virtue of this project that was built specifically for Antero. And so it could never have joined this system otherwise because the pipeline has expanded overall. The exponential increase in fuel usage that Antero's throughput causes, that is reasonably allocated to Antero so that the rates of pre-extension shippers don't increase. If we had assigned Antero some point lower on this exponential fuel curve, then pre-extension shippers would be paying higher rates than they would have absent this project. And that goes against the commission's no subsidy requirement. Would it be absent this project or would it be absent Antero's gas being present in the system? It's both because Antero's gas was only added to the system. It's not always both. There's times when it could just be a higher rate due to the presence of Antero's gas in the system. Here it's both because Antero couldn't have joined if this project wasn't built. When you say, I just wanna clarify one fact thing. When you say, is it true that 100% of firm capacity was already taken at the time Antero showed up or was a problem that there was some firm capacity left, but not remotely enough for what Antero needed? I believe there was some small amount of firm capacity left nowhere near the amount that Antero needed. But I think Tennessee could probably speak more specifically to the extent of that. But that just feeds into the fact that Antero couldn't have joined otherwise. I understand. Any other questions, Judge Rogers? No, thank you. All right. Thank you very much for your help. Thank you. Good morning. May I please report Paul Korman for the interveners. I apologize in advance for cough. I wanna go back to something from an hour ago and then I'm gonna go right back to the capacity question. There's no surprises here. In the 2018 filing, which is in joint appendix, the fuel rate for Antero was double. That's on JA 1176. Now, not all of the old filings are in the record, but the 2020 filing is in the record, JA 1044, and the fuel rate filing there was triple. So again, there's no surprise. The commission told them, and Tennessee, frankly, in the certificate proceeding, the fuel rate has to be incrementally priced to avoid the no subsidy. Now, on the capacity question, this case is actually governed by a joint stipulation of facts entered into before the hearing with the presiding administrative law judge. And you can find the joint stipulation on roughly page 504 of the joint appendix. It is a stipulated fact that this project created the 200,000 decatherms of capacity that Antero is using. It allows Tennessee to transport the Antero gas. So without the project, there is no Antero. Please. Put that back in terms of my question, and that is, at the time, on the preexisting system, was firm capacity maxed out, or it just wasn't going, I mean, they have a high volume they need firm capacity for, or was it that it was too small to accommodate what they needed? I believe it was maxed out, Your Honor, and I was scrambling to try to find the exact answer, but actually, based on the stipulation, I don't think it matters, because without the project, they don't exist. Okay, but if it does matter, is that information you can provide the court after argument? I will double-check, Your Honor. I can check this out. I'm assuming it's somewhere in the record somewhere. I will check the record. I believe it is, but... In one of these 2018 to 2021 years. Yes. So, the preexisting shippers, everybody knows fuel rates go up, fuel rates go down. As you pointed out, at different times of year, it's gonna have different intensities, and it's an annual average. The tariff number doesn't float. It stays there for the year, and then at the end of the year, we true up and true down, okay? Everybody understands that. The preexisting shippers' rates go up and go down based on what is going on on the preexisting system, because Intero could not ship on the preexisting system because we created this capacity for them. So, their volume... They couldn't ship firm. Could not ship firm. But they could have shipped, I keep telling them, bystander... Interruptible. Absolutely, they could have shipped interruptible, Your Honor, but they chose firm service. So, that's the truth. So, that means that for all the preexisting customers, who I assume some of which had firm capacity commitments, they couldn't have gotten any. Correct. Interruptible, as you know, that some days you're full, some days you're not. But on the days that full on firm capacity, the interruptible shippers don't ship. They chose firm capacity. They chose to execute a precedent agreement knowing they were signing up for a compression-only project. They understood. Now, we talk about this rate being triple. There are cases cited in our brief where, I think it's an Algonquin case, where the fuel rate on one path is seven times the rate, the general system rate. Another one where it's nine times. The incremental fuel rate is just a function of math. If you look at the fuel curves, they're all over this, they're in the record, that the further out you go, fuel in use increases exponentially. That's not a Tennessee issue. It's just a hydraulic fact. It's been explained to me by engineers many times. Mr. Coleman, why does Tennessee Pipeline have standing here as an intervener? As an intervener? Because it's our rate, Your Honor. It's your rate, but I mean, the pipeline is indifferent as to whether Antero pays part of the rate or the existing. I don't, I don't, I'm not sure. What's the injury? We're not, well, at the moment, we're not injured. We're not, we're not in a balance. We're just an intervener on the side of the commission. But under our precedence, you have to have standing to intervene on either side. Well, I think there is a risk. There's a potential risk to Tennessee that this shakes out in a way in which Tennessee ultimately might not fully collect its fuel cost. Remember, the commission's policy is Tennessee should be fuel neutral. And we also have an interest here. And I'm also here, by the way, Your Honor, for National Fuel Gas Distribution, who is one of the other customers on the system who would have to pay. So National Fuel Gas Distribution Corporation is another distributor. Yes, it's true. So they would have to pay more. They'd pick up the check. Okay, so there are injuries of little self-evidence and we'll see. And we are here to protect the interest in adjusting the reasonable rate. And also, as I said, not run the risk. I think we have, so. I'm not quite sure how you can be here as Tennessee to just, who's neutral as to what the rates are, as long as the fuel costs are covered, but also representing someone who has an interest in keeping their prices lower, even if that's at the expense of the tariff. This court, this court. The court encourages single breach from intervenors, Your Honor, and we're both intervenors in support of the commission. And I would point out that National Fuel and the others who, many of whom participated below, have not objected to the new fuel crediting mechanism, which is designed to make sure that there's no subsidy out of the way. So that the existing shippers don't have to pay for anterior service. And in turn, anterior is not subsidizing them. I also want to, for a minute, go on this wildly inconsistent point about the commission's policy. The commission's policy on incremental fuel is crystal clear and extremely consistent. If there is even a diminutive increase in the fuel rate, it's incrementally priced. Because the commission's policy is, a project has to stand without a subsidy from an existing shipper. The subsidy is a rate subsidy. Construction cost subsidy may be bigger, but a fuel rate subsidy is just as much of a subsidy. But if there's times when, there's times on the system, when you get to your indifference, the costs to the system are exactly the same, whether it's Antero gas coming in or National Gas increasing its own capacity by 10%. Why, in that situation, all of which is within the pre-existing capacity system, why does it make any sense for their rate to be different? They have no rights to the pre-existing capacity system. Their rights are only above. So they're paying, they're not paying seven, they're 7.62% is not the base rate plus. I mean, they have no rights. I mean, they certainly can come in and use the by-standing base, right? Oh, they could buy under the situation where now, yes, they have no, but they could come in, they could have come in to buy if there had been capacity available. How do we know at any particular day, it's May and they say, I wanna transport this much and there's room on the system to do it. They could come in as an interruptible shipper on the pre-existing system if they wanted to. When they put fuel in, it looks no, I mean, it doesn't have a name tag that's an interruptible. It's like there's capacity to put it in, we're putting it in today. Yeah, but they're paying for a firm service. So Tennessee has to provide that service each and every day, regardless of operating conditions. For an interruptible shipper, if they had chosen to do that, paid the lower fuel rate, they would have run the risk of being interrupted. But here they wanted firm service. So there's this increment of compression that was built to satisfy them. The record's clear that it takes three times as much gas, it's three times the energy to move the entire increment as it does the average system gas. And the system, Your Honor, the system always is, every annually is always, it's a roughly, let's say 75% lower. Sometimes it's higher, sometimes it's lower. But the capacity that they wanna use was created precisely for them. I wanna go back and finish one thing that I was gonna say about the inconsistency on the fuel. They talk about the Gulf South case and the Columbia Gulf case, where the commission said no incremental fuel. There, they had two studies, one from each company that said there would not be an increase in fuel rates. Commission specifically talked about that in those orders. And the commission was just clear that that's the way it was on those systems. Now, post hoc, they say, well, those people did studies differently than Tennessee did and maybe that way, under those studies, something would have come out differently. We had a hearing in this case. We had experts on both sides. They could have put anything in they wanted. They didn't. They accepted the validity of Tennessee's fuel curves. So there's no real argument about where the curve goes. Mr. Saxon testified that he reviewed the Tennessee curves and they correlated with his work. So we're just using the Tennessee's curves. Further out you go with throughput, the more, the higher the fuel burn is going to be, the fuel use is going to be. And Intero is over and above the existing system because they could not have transported gas on a firm basis, which is the service they wanted, could not do it on a firm basis on the existing system. It's a stipulated fact from before the hearing. Thank you. I see if my colleagues have any questions. Judge Rogers, any questions? No? All right. Thank you very much. Thank you, Your Honor. All right, Ms. Taylor, we'll give you three minutes for rebuttal. So first, I think that the advocate for the commission was talking a lot about the reasonable expectations of the existing shippers. None of that reasoning was set forth in the decision under review. So even to the extent that there was a connection articulated between those expectations and the rate that is under review, that is simply not yet. That doesn't- I'm not sure that's accurate. I mean, they talk about the whole principle of how they've allocated costs here is to protect. So it's, and they say it multiple times. And so that the costs of the presence of your gas on the system doesn't increase the costs of pre-existing shippers. I mean, they do say that. They don't identify them by name. Maybe you don't have an affidavit from them, but they say the whole point of this is to ensure that pre-existing shippers aren't put in the middle for Ontario's presence on the system. I think in the decision under review, what they said was that this actually tracks cost causation. And they didn't discuss in any detail- I'm saying that that's part of, you know, they do that in the sense of it's cost causation because you're responsible for the cost of your increased shipment. They're quite clear that they were applying their principles here, that you were the but-cause, but-for-cause of increased costs to have your capacity here, right? Right, and that's inconsistent with cost causation principles and the NP Paribas, which holds that, you know, you don't ask who came earlier and who came later. If you're just looking at the cost causation principles, it's the actual shipments on any given day, everybody is equally contributing. And that, you know, the sort of more basic point is that there might be ways to capture the reliance interests of the pre-existing shippers. We did propose one, that was at step two of the section five challenge that we brought, and the commission didn't reach it, but that was effectively everybody should pay the same up until we reached that maximum that they could have expected under their contracts. And then if the rate that they're going to be charged is more than that maximum, then Intero would pay that increment. There might be other ways to approach a methodology that actually captures reliance. Is there any firm capacity left on the system when Intero showed up? I get that it wasn't enough for the volumes you wanted to do, but was there any firm capacity left? My understanding is that there could have been potentially some firm capacity subscribed to, but not nearly enough. Could it potentially have been? Or that there was, I mean, either there was space or there wasn't. I don't have a number for how much firm capacity. But was there some? My understanding is that, well, again, I don't, yes. I believe that if Intero had wanted a much, much smaller amount of firm capacity. I guess you wanted more for sure. That's why you all did this. And so, and if we had subscribed to that lower number, as your honor pointed out, and then no compression engines were added, then, you know, I don't know, we might have a different record and different reasoning about how the commission approached that. Well, the project was built on the basis that you needed firm capacity and that you were going to subscribe to 100% of the expansion capacity, correct? Yes, that's correct. All right. So. We'll let you sum up in one sentence here. Pardon? We'll let you sum up here in one sentence, whatever. My one sentence is that this methodology doesn't even attempt to capture the reliance interest of the existing shippers. We can set aside the later arriving shippers, whether you consider that argument preserved or not preserved, but there is no effort whatsoever to capture the reasonable expectations of those pre-existing shippers based on, you know, what they knew would be fluctuating usage, even of the pre-existing capacity. And that is what fundamentally makes this unjust and unreasonable. Thank you very much to all cases submitted.
judges: Millett; Rao; Rogers